IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ERNEST R. SWOGGER, | ) | Case No. 5:16CV178 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.      Introduction

Plaintiff, Ernest R. Swogger ("Swogger"), seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act").  This matter is before the court pursuant to 42 U.S.C. §405(g), 42 U.S.C. §1383(c)(3) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be AFFIRMED.

## II.     Procedural History

Plaintiff applied for supplemental security income on March 5, 2012.  (Tr. 149)  Mr. Swogger alleged that his disability began on January 26, 2012.  (Tr. 149-153)  Mr. Swogger's application was denied initially and after reconsideration.  (Tr. 78, 88)  On February 13, 2013, Mr. Swogger requested an administrative hearing. (Tr.106-107)

A hearing was held before the Administrative Law Judge ("ALJ"), Keith J. Kearney, on July 24, 2014. (Tr. 26-66)  The ALJ issued a decision on September 23,  2014 finding that Mr. Swogger was not disabled (Tr. 10-21)  Mr. Swogger requested a review of the hearing decision on October 16, 2014. (Tr. 8)  On November 23, 2015, the Appeals Council denied review, rendering the ALJ's decision final. (Tr. 1-5)

On January 25, 2016, Mr. Swogger filed an appeal of the ALJ's final decision in this court. (Doc. 1)  Defendant answered and filed the transcript of the administrative proceedings on April 21, 2016.  (Docs. 8 and 9)  Mr. Swogger filed a brief on the merits on May 17, 2016 (Doc. 10) and Defendant filed her brief on the merits on August 15, 2016 (Doc. 15), making the matter ripe for review.

## III.  Evidence

### A.  Personal, Educational and Vocational Evidence

Mr. Swogger was born in 1973 and is a high school graduate.  (Tr. 32, 149)  He was 39 years old at the time he filed his application for benefits.  His past relevant work was as a short order cook, a line cook, a material handler, a bricklayer helper, a heavy equipment operator, a gas station attendant, a fry cook, and a warehouse worker.  (Tr. 58-59)

### B.  Medical Evidence

On January 25, 2012, plaintiff was admitted to the Mercy Medical Center after reporting right-sided weakness and numbness.  (Tr. 384)  Diagnostic testing revealed that plaintiff had up to 39% occlusion on his right internal carotid artery and total occlusion of his left internal carotid artery, and he had experienced a stroke.  (Tr. 384, 389, 400)  Plaintiff had not seen a doctor for "a long time" and was not taking any medicine for hypertension or diabetes.  (Tr. 389, 391)  He was diagnosed with acute cerebrovascular accident with bilateral infarct, diabetes mellitus,

2

hyperlipidemia and tobacco abuse.  (Tr. 384)  Mr. Swogger was treated overnight and was discharged.  (Tr. 384)  He was prescribed Zocor, Metformin, and Aspirin.  (Tr. 384)

Mr. Swogger had a follow-up appointment on February 10, 2012 and his medications were refilled.  (Tr. 476-477)  Mr. Swogger's only complaint at the follow up appointment was that one of the medications was causing diarrhea and bloating. (Tr. 476) This medication was discontinued and replaced with a different one.  (Tr. 477)

On February 18, 2012, plaintiff returned to Mercy Medical Center reporting weakness in his right leg that prevented him from walking to the bathroom. (Tr. 449)  He needed to hold onto something to walk.  (Tr. 449)  Mr. Swogger also reported right arm weakness and facial droop. (Tr. 449)  Plaintiff was admitted to Mercy Medical Center from February 18, 2012 to February 21, 2012.  (Tr. 271, 372)  He was transferred to University Hospital in Cleveland for further treatment on February 21, 2012.  (Tr. 449-450)  An MRI showed scattered foci of abnormal diffusion in both frontoparietal lobes consistent with a stroke, suspicion of vascular congestion versus intravascular thrombus within the left temporal lobe and a lack of normal flow in the left carotid artery caudal to its supraglenoid segment and suspected occlusion or extremely slow flow of the distal left vertebral artery.  (Tr. 271-272)  Aggressive medical management was recommended.  (Tr. 272)  He was prescribed Lispro, Plavix, Lantus, Vicodin and Simvastatin and advised to follow up with the Neurology Clinic as an outpatient.  (Tr. 272)  Plaintiff was also encouraged to increase his activity level and was advised by an attending physician, Dr. Xiong, that he was "able to return to work."  (Tr. 272)

Plaintiff returned to Mercy Medical Center for a follow up appointment on February 28, 2012.  (Tr. 445-446)  He reported that the weakness he had been experiencing had resolved, but he was now noticing some problems with his coordination.  (Tr. 445)  He also reported some

3

excessive snoring at night, some daytime somnolence and falling asleep while driving.  (Tr. 445)

On examination no acute neurologic deficits were observed.  (Tr. 445)  Plaintiff's diagnoses

were stated as recurrent transient ischemic attack and diabetes Mellitus. (Tr. 446)

On April 5, 2012, plaintiff returned to the Mercy Medical Center complaining of leg pain.

(Tr. 441-442)  Plaintiff reported that the pain occurred when he walked only half a block and

described the pain as an achiness and soreness. (Tr. 414)  On examination, plaintiff had no

reproduction of the pain, no joint tenderness in the legs, and neurological findings were

unremarkable.  (Tr. 441)  His blood sugar levels remained high.  (Tr. 442)  A nerve conduction

study was ordered to determine the cause of the leg pain.  (Tr. 442)

On April 11, 2012, plaintiff returned to the University Hospital neurology clinic for a

follow up appointment.  (Tr. 420)  He denied any recurring right sided weakness, tingling or

numbness.  (Tr. 420)  He reported that he was strictly following dietary modifications and his

medication regimen.  (Tr. 420)  On examination, plaintiff had regular heart rate and rhythm, no

facial sensory deficit or asymmetry, normal motor strength in his extremities, intact sensation

and normal reflexes.  (Tr. 421)

On April 23, 2012, Mr. Swogger was transported by paramedics Mercy Medical for

slurred speech and right sided neurological symptoms.  (Tr. 430) Plaintiff reported tingling in his

right hand, drooping in the right corner of his mouth, and right leg numbness. (Tr. 430)  Plaintiff

admitted that he had started smoking again.  (Tr. 430)  His symptoms resolved in the emergency

room.  (Tr. 430-431) A CT scan showed no acute intracranial findings.  (Tr. 479)   Plaintiff was

diagnosed with probable transient ischemic attack and discharged in stable condition.  (Tr. 431)

On April 27, 2012, an EMG and a nerve conduction study showed that plaintiff had moderate to

severe peripheral polyneuropathy.  (Tr. 425)

Plaintiff began treating with Dr. J. Richard Ziegler, M.D. on July 16, 2012.  (Tr. 516)  He reported chronic pain in the lower extremities that is constant, sharp in nature and rated as 8 on a 10-point scale.  (Tr. 516)  He also felt like his legs were going to "give up" after walking for a long period of time.  (Tr. 516)  His blood sugars remained high, between 200 and 300.  (Tr. 516) Dr. Ziegler diagnosed diabetes, mellitus, hypertension, hyperlipidemia, history of bilateral carotid blockage and cerebrovascular accident, obstructive sleep apnea and peripheral neuropathy.  (Tr. 516)  He prescribed Gabapentin, Metoprolol, Zocor and Plavix.  (Tr. 516)

Plaintiff had follow-up appointments with Dr. Ziegler on October 1, 2012 and February 18, 2013 and no significant changes were noted.  (Tr. 509-511)  Dr. Ziegler noted that plaintiff's blood pressure was well controlled at the moment. (Tr. 512)  He observed that plaintiff exhibited decreased sensation in the right lower extremity, but otherwise normal motor strength, normal reflexes and a normal gait.  (Tr. 510, 513, 518)  Dr. Ziegler completed a multiple impairment questionnaire on May 18, 2013.  (Tr. 520-527)

Plaintiff had a follow-up appointment with Dr. Ziegler on July 22, 2013.  (Tr. 536-538) Plaintiff reported that he was stable and that his blood pressure had been in the normal range. (Tr. 536)  Plaintiff continued to experience lower extremity pain but stated that medication helped to relieve his symptoms but didn't completely take the pain away. (Tr. 536)  Plaintiff denied any chest pain, shortness of breath, or other medical complaints. (Tr. 536)  Dr. Ziegler noted that plaintiff had lost 11 pounds, and his blood pressure was "well controlled."  (Tr. 537) Dr. Ziegler's notes state that plaintiff had normal motor strength, normal reflexes, normal gait, but decreased sensation in his feet. (Tr. 536)

### C. Opinion Evidence

#### 1. Dr. J. Richard Ziegler – May 2013

Treating source, Dr. Ziegler, completed a multiple impairment questionnaire on May 18, 2013. (Tr. 520-527) He diagnosed cerebrovascular accident in January 2012, diabetes mellitus, peripheral neuropathy, hyperlipidemia, hypertension, bilateral stenosis of carotid arteries, multiple transient ischemic attacks, and obstructive sleep apnea. (Tr. 520) Dr. Ziegler opined that Mr. Swogger's prognosis was fair. (Tr. 520) Dr. Ziegler listed his positive clinical findings as: claudication, decreased sensation of the right lower extremity compared to the left, and blurry vision. (Tr. 520) Dr. Ziegler also cited to CT scans, an MRI, a carotid Doppler scan, blood testing, an EMG, nerve conduction testing, and a sleep study in support of his diagnoses. (Tr. 521) Dr. Ziegler listed plaintiff's symptoms as pain in the bilateral lower extremities (at rest, worse with walking), fatigue, tiredness, constant pain in the legs, and dyspnea and pain on exertion (1 block flat or 1 flight of stairs). (Tr. 521) Dr. Ziegler opined that these symptoms were consistent with plaintiff's impairments. (Tr. 521) Dr. Ziegler stated that the nature of plaintiff's pain was dull, 4/10 in intensity when sitting, but sharp, 10/10 when walking. (Tr. 521-522) Dr. Ziegler reported that the symptoms and limitations stated in the report had been present since plaintiff suffered his stroke in January 2012. (Tr. 526)

Dr. Ziegler opined that Mr. Swogger was able to sit for 1 hour and stand/walk for 2 hours total in an 8-hour workday. (Tr. 522) In support of these limitations, the doctor stated, "please refer to functional capacity support." (Tr. 522) Dr. Ziegler reported that Mr. Swogger had significant limitations in doing repetitive lifting. (Tr. 523) In addition, Dr. Ziegler reported that Mr. Swogger was significantly limited in his ability to use his upper extremities for grasping, turning, and twisting objects, performing fine manipulations, and reaching. (Tr. 523-524) However, Dr. Ziegler's questionnaire indicated that these arm/hand limitations were "per

6

patient." (Tr. 523-524)  Dr. Ziegler also indicated that plaintiff was incapable of kneeling, bending or stooping. (Tr. 526)  Dr. Ziegler stated that he had increased one of plaintiff's medications but that plaintiff had not improved.  (Tr. 524)  Dr. Ziegler opined that plaintiff's pain, fatigue and other symptoms would frequently interfere with his attention and concentration. (Tr. 525)  However he indicated that plaintiff was capable of moderate stress. (Tr. 525)  Dr. Ziegler reported that plaintiff was not a malingerer.  (Tr. 525)  Dr. Ziegler opined that Mr. Swogger would need to take unscheduled 10-15 minute breaks every 30 minutes.  (Tr. 525)  Dr. Ziegler stated that plaintiff had good and bad days.  (Tr. 526)  He believed that Mr. Swogger would be absent from work about two to three times per month due to his physical impairments. (Tr. 526)

### 2.  Non-Examining State Agency Medical Consultants
#### a.  Teresita Cruz, M.D. – August 2012

Non-examining medical consultant, Teresita Cruz, M.D., reviewed Mr. Swogger's file on August 21, 2012 and opined that he could sit for about six hours total and could stand/walk for about six hours in an 8-hour workday. (Tr. 74)  She opined that he could lift/carry 20 pounds occasionally and 10 pounds frequently. (Tr. 74)  Ms. Cruz reviewed plaintiff's treatment records through April 2012.  (Tr. 70-72)

#### b.  Edmond Gardner, M.D. – December 2012

Non-examining medical consultant, Edmond Gardner, M.D., reviewed plaintiff's medical file up through April 2012 and affirmed the opinion provided by Dr. Cruz.  (Tr. 82-87)

### D.  Testimonial Evidence

#### 1.  Testimony of Ernest Swogger

The hearing in this matter took place on July 24, 2014.  (Tr. 26)  Mr. Swogger testified that he was forty-one years old and had completed high school.  (Tr. 32)  Mr. Swogger is 6'2" and, at the time of the hearing, weighed 245 pounds.  (Tr. 32)  He was living with his wife and two of his children, ages 13 and 15 and two of his wife's children.  (Tr. 32, 55-56)

Mr. Swogger had worked as a brick mason until the end of 2011.  (Tr. 48)  The work was seasonal.  (Tr. 33)  He was working for a friend and was being payed under the table.  (Tr. 49)  Mr. Swogger had a stroke in January 2012.  Thereafter, he had been called to come back to work but, according to Mr. Swogger, did not return because his doctors wouldn't release him.  (Tr. 33)

Mr. Swogger also previously worked at a cheese company.  (Tr. 49)  There he was required to move heavy blocks of cheese around with a pellet jack.  (Tr. 49)  That employment was temporary.  (Tr. 49)  He also worked at a landfill in 2005 driving a rock crawler.  (Tr. 50)  Prior to that, he worked for his uncle at an old strip mine in Mineral City, Ohio.  (Tr. 51)  He was fired from that job after being accused of stealing.  (Tr. 51)  Mr. Swogger also had work experience as a gas attendant and a cook.  (Tr. 52-54)  Mr. Swogger was convicted of drug trafficking and went to prison in 2004.  (Tr. 51-52, 46)

Mr. Swogger testified that he continues to experience weakness in both legs, dizziness, difficulty with hand/eye coordination and shortness of breath.  (Tr. 34)  He has difficulty ascending a flight of stairs.  (Tr. 34)  His ability to lift objects has also diminished.  (Tr. 34)  He believed that he could lift about 15 pounds, but not repetitively.  (Tr. 34)  Since he stopped working, Mr. Swogger has noticed that he has difficulty concentrating and with his memory. (Tr. 42)

In addition to suffering the stroke, Mr. Swogger has also been diagnosed with diabetes. (Tr. 35)  He takes medication for his diabetes but testified that his blood sugar levels are not well controlled.  (Tr. 35)  He testified that he suffers from neuropathy in his legs and has blurry vision as a result of his diabetes.  (Tr. 35)  Because of his vision issues, he is unable to read and his wife assisted him with completing the paperwork for his disability claim.  (Tr. 36)  The neuropathy causes pain in his legs and feet and he is unable to stand for more than 15 minutes at a time.  (Tr. 36)  He believed he would be able to walk about a half a block before needing to stop and take a break.  (Tr. 36)

Mr. Swogger also has high blood pressure but it is maintained at a safe level with medication.  (Tr. 37)  He stated that he suffers from headaches about four days a week as a result of his high blood pressure.  (Tr. 37)  The headaches typically last from 15 minutes to four or five hours.  (Tr. 38)  He takes Tylenol for his headaches and lies down and takes naps.  (Tr. 38)

Mr. Swogger often naps during the day and had trouble sleeping at night.  (Tr. 39)  He testified that he is always tired and suffers fits of rage due to the medications he takes.  (Tr. 39)  The medications also make it necessary for him to use the restroom at least once an hour.  (Tr. 39)  He also has experienced diarrhea and dizziness as a result of his medications. (Tr. 40)

Mr. Swogger does not help with the housework or the grocery shopping.  (Tr. 43)  His wife does these things for him.  (Tr. 43, 56)  A typical day involves him getting up, eating breakfast, letting the dogs out and then sitting on the couch 90% of the day.  (Tr. 55)  He only gets up to go to the bathroom.  (Tr. 55)  His wife does all the cleaning, cooking, and laundry.  (Tr. 56)  She also assists him when he takes a shower due to the weakness in his legs.  (Tr. 57)

Mr. Swogger testified that he does not regularly see Dr. Ziegler.[1] He testified that he visits Dr. Manhart once every three months. (Tr. 43-44)

### 2. Vocational Expert, Thomas Nimberger

Thomas Nimberger, a vocational expert ("VE"), testified at plaintiff's hearing. (Tr. 57-65) Mr. Nimberger considered plaintiff's past relevant work to be short-order cook, material handler, bricklayer helper, heavy equipment operator, gas station attendant, fry cook, and warehouse worker. (Tr. 58-59)

The ALJ asked the VE to assume a hypothetical individual with the past jobs of plaintiff who was limited to light work and would be further limited to bilateral frequent fingering, bilateral frequent foot controls and bilateral frequent hand controls. (Tr. 59) The individual would require a sit/stand option which would allow the individual to sit or stand alternately at-will provided that he was not off-task more than 10% of any workday. The hypothetical individual would be further limited to only occasionally climbing ramps and stairs, never climbing ladders, scaffolds or ropes, occasionally balancing, occasionally stooping, kneeling, crouching and occasionally crawling. The individual must not be exposed to hazards such as heights, machinery, concentrated humidity, wetness and/or extreme heat. (Tr. 59-60) The individual was capable of avoiding ordinary hazards in the workplace such as boxes on the floor, doors ajar or approaching people in vehicles. (Tr. 60) The hypothetical individual would be limited to hearing and understanding simple oral instructions, simple tasks, limited to routine and repetitive. (Tr. 60) The individual could not be required to operate a vehicle during the course of the workday. (Tr. 60) He would be limited to simple work related decisions with occasional casual interaction with a small group of coworkers. (Tr. 60) The individual would be

---

[1] The medical records show that Isis Manhart, MD (R), may have met with plaintiff and dictated the notes for J. Richard Ziegler, plaintiff's treating source.

limited to occasional superficial interaction with the public and would be limited to tolerating few changes in a routine work setting that took place gradually and infrequently. (Tr. 60)

Given the limitations of the hypothetical individual, the VE testified that he would not be able to perform the past relevant work of plaintiff.  (Tr. 61)  However, the VE opined that this individual would be able to perform the jobs of packer, with 875 jobs in northeast  Ohio and 88,000 in the national economy; small products assembler or bench assembly, with 610 local jobs and 79,000 nationally; cafeteria attendant, with 710 local jobs and 92,000 national jobs.  (Tr. 61)

The VE was then asked to assume that the individual would also miss at least one day of work per month.  (Tr. 62)  The VE testified that he thought the individual would still be able to perform the listed jobs.  (Tr. 62)  However, he opined that missing two or more days per month would preclude any work.  (Tr. 62)

The ALJ next asked the VE to assume that the hypothetical individual was limited to sedentary work rather than light as in the first hypothetical question.  (Tr. 63)  The VE testified that such an individual would be able to perform the job of polisher, with 410 local jobs and 39,000 nationally; the job of mailing house worker, with 500 local jobs and 48,000 nationally; and the job of document preparer, with 900 local jobs and 37,000 national jobs.  (Tr. 63)

The VE was next asked to assume that the previous hypothetical individual (with sedentary exertion ability) would miss two days of work per month.  (Tr. 63)  The VE testified that there would not be any employment for such an individual. (Tr. 63-64)

Plaintiff's attorney asked Mr. Nimberger to further assume that the individual would need to take 10-15 minute breaks after working for about 30 minutes.  (Tr. 64)  The VE testified that

this limitation would preclude all of the listed jobs.  (Tr. 64)  He further testified that an hour of bathroom breaks during the day would preclude work.  (Tr. 65)

## IV.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[2]....

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[13] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's

---

[2] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

**V.     The ALJ's Decision**

The ALJ issued a decision on September 23, 2014.  A summary of his findings is as follows:

1. Mr. Swogger had not engaged in substantial gainful activity since February 24, 2012, the application date. (Tr. 15)

2. Mr. Swogger had the following severe impairments: diabetes mellitus, peripheral neuropathy, status post cerebrovascular accident, hyperlipidemia, obesity, and hypertension.  (Tr. 15)

3. Mr. Swogger did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 16)

4. Mr. Swogger had the residual functional capacity to perform sedentary work, except he could frequently handle and finger bilaterally and use hand and foot controls.  He could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl, but could never climb ladders, ropes or scaffolds.  He was restricted from hazards such as unprotected heights or dangerous machinery, but was able to avoid ordinary hazards in the workplaces, such as boxes on the floor, doors ajar, or approaching people or vehicles.  He was never required to operate a motor vehicle during the course of a workday.  He must avoid concentrated exposure to humidity and wetness and concentrated exposure to extreme heat.  He was limited to hearing and understanding simple oral instructions.   He was limited to simple, routine, repetitive tasks and simple work-related decisions.  He was limited to occasional interaction with a small group of co-workers, where the contact would be casual in nature and limited

13

to occasional, superficial contact with the public.  He was limited to tolerating few changes in a routine work setting, and when said changes do occur, they would need to take place gradually and would occur infrequently.  (Tr. 16)

5.  Mr. Swogger was unable to perform past relevant work. (Tr. 19)

6.  He was born on June 9, 1973 and was 38 years old on the alleged disability date.  Thus he was considered a younger individual age 18-44 on the date his application was filed.  (Tr. 20)

7.  Mr. Swogger had at least a high school education and was able to communicate in English. (Tr. 20)

8.  Transferability of job skills was not an issue because Mr. Swogger was not disabled whether or not he had transferable job skills. (Tr. 20)

2.  Considering Mr. Swogger's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that he could perform.  (Tr. 20)

Based on the foregoing, the ALJ determined that Mr. Swogger had not been under a disability since February 24, 2012, the date his application was filed.  (Tr. 21)

## VI.  The Parties' Arguments

Plaintiff filed his brief on the merits on May 17, 2016.  (Doc. 10)  Plaintiff argues that the ALJ failed to properly weigh the medical opinion evidence and failed to properly determine his residual functional capacity.  Specifically, plaintiff argues that the ALJ erred in assigning only "some weight" to the medical opinion of the treating source, Dr. Ziegler.  (Doc. 10, p. 9) Plaintiff contends that the ALJ mischaracterized Dr. Ziegler's opinion and the support on which it relied.  Plaintiff also argues that the ALJ failed to point to substantial evidence contradicting the opinion of Dr. Ziegler.  (Doc. 10, p. 10)  Plaintiff also argues that the ALJ failed to identify any evidence in support of his residual functional capacity assessment. (Doc. 10, p. 14)  Plaintiff argues that the ALJ did not cite to any specific medical evidence and that he is not permitted to create an RFC out of his own lay interpretation of the medical evidence. (Id.)  Finally, plaintiff

14

asserts that the ALJ failed to properly evaluate his credibility and that his assessment of plaintiff's credibility was not supported by substantial evidence. (Doc. 10, p. 15-17)

Defendant filed her brief on the merits on August 15, 2016.  (Doc. 13)  Defendant contends that the ALJ properly weighed the treating medical source opinion of Dr. Ziegler and properly determined plaintiff's residual functional capacity.  Defendant points out that Dr. Ziegler met with plaintiff on only three occasions[3] and that his opinions were based in part on plaintiff's subjective statements and inconsistent with his own examination findings.  (Doc. 13, p. 8-9)  Defendant further contends that it was proper for the ALJ to determine that plaintiff's statements regarding his pain and dysfunction were not entirely credible.  (Doc. 13, pp. 11-13)

## VII.    Law & Analysis

### A.  Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

---

[3] As noted previously, the medical records show that plaintiff may have actually met with a resident physician, Isis Manhart, MD, who dictated the notes for J. Richard Ziegler, plaintiff's treating source.

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307

16

(7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D.

Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was

discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS

141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist.

LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S.

Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### D.  Treating Physician Rule

The administrative regulations implementing the Social Security Act impose standards on

the weighing of medical source evidence. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).  In

making determinations of disability, an ALJ evaluates the opinions of medical sources in

accordance with the nature of the work performed by the source. *Gayheart v. Comm'r of Soc.

Sec.,* 710 F.3d 365, 375 (6th Cir. 2013).  The treating physician rule requires that "[a]n ALJ []

give the opinion of a treating source controlling weight if he finds the opinion well-supported by

medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the

other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541,

544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

If the ALJ does not give the opinion controlling weight, then the opinion is still entitled

to significant deference or weight that takes into account the length of the treatment and

frequency of the treatment relationship, the supportability of the opinion, the consistency of the

opinion with the record as a whole, and whether the treating physician is a specialist. 20 C.F.R. §

416.927(c)(2)-(6).  The ALJ is not required to explain how he considered each of these factors

but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. §

416.927(c)(2); see also *Cole*, 661 F.3d at 938 ("In addition to balancing the factors to determine

what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned."). "These reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (July 2, 1996)) (internal quotation marks omitted).

The Sixth Circuit has noted,

> The conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors. Otherwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.

*Id*. at 377.  On the other hand, the ALJ is not obligated to provide an "exhaustive factor-by-factor analysis."  See *Francis v. Comm'r of Soc. Sec.* 414 Fed. Appx. 802, 804 (6th Cir. 2011).

Here, the ALJ assigned "some weight" to the statement made by Dr. Ziegler in the multiple impairment questionnaire. (Tr. 19)  In support of the weight assigned to the opinion of Dr. Ziegler, the ALJ stated,

> As for the opinion evidence, the claimant's treating doctor, JR Ziegler, Jr. MD filled out a "Multiple Impairment Questionnaire" dated February 18, 2013.  He opined that claimant could sit one hour and stand/walk two hours in an eight-hour workday, and needs to get up and move around every hour.  Dr. Ziegler indicated to "see functional capacity evaluation" with regard to the claimant's lifting and carrying.  This statement is given some weight.  The noted "functional capacity evaluation" is not included in the medical evidence of record.  However, many limitations noted in the questionnaire were noted as "per the patient," rather than the doctor's own opinion.  Further, the evidence does not support such extreme limitations, nor does it support that he would miss work two to three times a month.  Dr. Ziegler's own examination findings are mild.  The claimant has normal gait and full strength.

18

The ALJ adequately explained why he chose to give "some weight" to the opinion of Dr. Ziegler.  He determined that Dr. Ziegler's opinion was based, in part, on the subjective complaints of plaintiff rather than Dr. Ziegler's own opinion.  As noted by the ALJ, Dr. Ziegler's questionnaire indicates that some of his opinions were merely an expression of the symptoms reported by plaintiff.   Because the ALJ properly questioned the veracity of plaintiff's statements regarding the severity of his symptoms, it was also reasonable for him to discount the portions of Dr. Ziegler's opinion that were based on plaintiff's subjective complaints. *See Durio v. Comm'r of Soc. Sec.,* 1996 U.S. App. LEXIS 12184 (6th Cir., April 10, 1996).

The ALJ also found that there was little objective medical support for the extreme limitations stated in Dr. Ziegler's opinion and that there was no objective medical support for Dr. Ziegler's opinion that plaintiff would miss work two to three times per month.  (Tr. 19)  While it is true that plaintiff suffered strokes in January and February of 2012, he was discharged in stable condition and was advised that he was able to return to work. (Tr. 272, 385)  At a follow up appointment in April 2012, plaintiff denied recurrence of any right-sided weakness or tingling or numbness. (Tr. 420) He denied any episodes of issues with his vision and/or his ability to speak.  (Tr. 420)

The ALJ also noted that Dr. Ziegler's opinion referred to the attached "functional capacity evaluation" as support for some of his opinions but that the functional capacity evaluation had not actually been attached to Dr. Ziegler's opinion.  Plaintiff argues that the ALJ has a duty to develop the record whenever the record does not contain all of the necessary information.  Plaintiff further argues that the ALJ did not fulfill that duty in this case and points to the fact that there is no evidence demonstrating that the ALJ attempted to obtain the missing functional capacity evaluation which was not attached to Dr. Ziegler's questionnaire.  However,

19

in this instance, if plaintiff believed that it was necessary for the ALJ to review the functional capacity report, _he_ should have submitted it to the ALJ for review.  Although the ALJ has a duty to ensure that a reasonable record has been developed, see _Johnson v. Sec'y of Health & Human Servs.,_ 794 F.2d 1106, 1111 (6th Cir. 1986), it is incumbent upon the claimant to provide an adequate record upon which the ALJ can make an informed decision regarding the claimant's disability status. See _Landsaw v. Sec'y of Health & Human Servs.,_ 803 F.2d 211, 214 (6th Cir. 1986).  At the hearing, plaintiff's counsel requested ten days to supplement the record and the ALJ granted him two weeks.  (Tr. 44)  Despite the fact that the ALJ held the record open for two additional weeks following the hearing, there is no indication that plaintiff or his counsel attempted to supplement the record or provide the missing functional capacity report.  Nor is there any indication that the information contained in this functional capacity report would have contained any objective medical evidence regarding plaintiff's limitations.  In fact, it is likely that plaintiff's argument that the ALJ should have obtained this report is nothing more than a red herring.  Plaintiff does not argue that the report contained evidence which would have led to the ALJ assigning greater weight to the opinion of Dr. Ziegler. Plaintiff merely argues that the ALJ should have obtained it.

The ALJ also determined that the opinion expressed in the multiple impairment questionnaire was inconsistent with Dr. Ziegler's own mild examination findings, including the facts that plaintiff had a normal gait and full strength.  (Tr. 19)  While plaintiff had complaints of leg pain (Tr. 509, 516), and EMG/nerve conduction studies confirmed the presence of polyneuropathy (Tr. 425, 510), plaintiff reported that medication helped relieve his pain. (Tr. 536)  Dr. Ziegler's examination of plaintiff revealed only a positive finding for decreased sensation in plaintiff's feet or lower right extremity. (Tr. 510)  Dr. Ziegler's notes reveal that

plaintiff has intact sensation, intact coordination, normal motor strength, normal reflexes and a normal gait. (Tr. 19, 510, 513, 518)

The undersigned finds that the ALJ's reasoning was sufficient to support his decision to assign less than controlling weight to the opinion of Dr. Ziegler.  The ALJ's decision was supported by substantial evidence and the undersigned recommends that the court affirm the ALJ's decision.

**C.      Residual Functional Capacity**

Plaintiff also argues that the ALJ failed to identify any specific evidence supporting his assessment of plaintiff's residual functional capacity. (Doc. 10, p. 14)  Plaintiff contends that the ALJ created a residual functional capacity based on his own lay interpretation of the medical findings. (Id.)   The undersigned disagrees.

An ALJ's residual functioning capacity determination is proper when it is based upon "all of the relevant medical and other evidence." 20 C.F.R. § 416.945 (a)(3).  Relative to the sequential outline, the ALJ determines the residual functional capacity just before deciding whether the claimant can perform his past relevant work (Step Four) and whether there are other jobs in the national economy that the claimant can perform.  A claimant is not disabled if he can perform past relevant work.  At the final step, Step Five, the ALJ considers the claimant's residual functional capacity and his age, education, and work experience to determine whether the claimant may work.  A claimant is disabled if he is unable to work or there are no jobs the claimant is capable of performing. See 20 C.F.R. § 404.1520(a)(4).

At its most basic level, a claimant's residual functional capacity is simply an indication of [his] work-related abilities despite his limitations. See 20 C.F.R. § 404.1545(a)(1).  The residual functional capacity is not a medical opinion, but an administrative determination reserved to the

Commissioner. See 20 C.F.R.§ 404.1527(e)(2).  Accordingly, the ALJ bears the responsibility

for determining a claimant's residual functional capacity, based on all of the relevant evidence.

See 20 C.F.R. § 404.1545(a)(3).

      Under 42 U.S.C. § 405(g), the findings of the ALJ are conclusive if they are supported by

substantial evidence.  The substantial evidence standard presupposes that there is a "zone of

choice" within which the Agency may proceed without interference from the courts. *Mullen v.*

*Bowen,* 800 F.2d 535, 545 (6th Cir. 1986).  The ALJ's decision must be affirmed if it is

supported by substantial evidence even if the reviewing court would have decided the matter

differently and substantial evidence also supports a different conclusion. <u>*Her v. Comm'r of Soc.*</u>

<u>*Sec.,*</u> 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen*, 800 F.2d at 545.

      Here, the ALJ reviewed the medical opinions in the record and provided good reasons for

assigning only "some weight" to Dr. Ziegler.  The ALJ explained that Dr. Ziegler's opinion was

based, in part, on plaintiff's subjective complaints.  Even the questionnaire completed by Dr.

Ziegler illustrates this point.  Dr. Ziegler states that some of his opinions are "per patient," (Tr.

523, 524) and elsewhere indicates that his conclusion regarding work stress is based on patient's

statements. (Tr. 525)  As already noted, the ALJ also determined that Dr. Ziegler's opinion was

not supported by his own examination findings.

      The ALJ also reviewed the opinions of the reviewing medical consultants and determined

that the combination of plaintiff's impairments suggested greater limitations than opined by

them.  (Tr. 19)  The ALJ states that the consulting physicians' opinions were entitled to some

weight, "however, the combination of the claimant's impairment suggests greater limitation to

sedentary exertion." (Tr. 19)  Plaintiff argues that the ALJ could not simply "split the baby" and

find work limitations somewhere in between the treating physician and the consulting medical

experts.  However, while it is true that an ALJ may not substitute his own medical judgment for

that of an unopposed treating medical source opinion, it is within his province to resolve any

conflicts and to formulate a residual functional capacity by drawing on the various medical

reports.  The ALJ was not required to fully adopt the limitations prescribed in any single medical

source opinion.  *See Griffith v. Comm'r of Soc. Sec.,* 582 F. App'x 555, 562 (6th Cir. 2014).  The

ALJ properly based his determination of plaintiff's residual functional capacity on all the

relevant evidence.  This evidence included the medical opinions of three different physicians as

well as the plaintiff's own statements regarding his limitations.[4]  The undersigned finds that

substantial evidence supported the ALJ's determination of plaintiff's residual functional

capacity.

## D.      Credibility of Mr. Swogger

Plaintiff also contends that the ALJ improperly evaluated his credibility.  (Doc. 10, pp.

24-28)  Plaintiff argues that the ALJ's assessment of plaintiff's credibility was not supported by

substantial evidence in the record.  Plaintiff contends that the ALJ improperly relied on his own

observations during the hearing and isolated evidence from the record when determining that

plaintiff's testimony was not completely reliable.  (Doc. 10, pp. 25-27)

It is for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses,

including that of the claimant. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th  Cir.

1997); *Crum v. Sullivan,* 921 F.2d 642, 644 (6th Cir. 1990); *Kirk v. Sec'y of Health & Human

Servs*., 667 F.2d 524, 538 (6th Cir. 1981).  However, the ALJ is not free to make credibility

determinations based solely upon an "intangible or intuitive notion about an individual's

credibility." Soc. Sec. Rul. 96-7p, 1996 WL 374186, at * 4.  Rather, such determinations must

---

[4] As previously noted, the medical evidence also contains a note from Dr. Xiong that plaintiff was capable of returning to work as early as February 22, 2012.   (Tr. 272)

find support in the record. Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record." *Rogers v. Comm'r of Soc. Sec.* 486 F.3d 234, 247 (6th Cir. 2007). The entire case record includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record. The consistency of the various items of information contained in the record must be scrutinized. Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect. *Id.*

Social Security Ruling 96-7p also requires that the ALJ explain his credibility determinations in his decision such that it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id*. In other words, blanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence. *Id*.

Here, the ALJ provided the following specific explanation for his assessment of plaintiff's credibility.

> The claimant appeared to not have much motivation to work, even before the strokes occurred. The majority of his work was performed under the table. The claimant testified he stopped working in 2012. He was doing seasonal work as a brick mason and stated he was called back to work, but he could not return because his doctors would not release him to return to work. However, medical records indicate, when he was discharged from the hospital in February 2012, he was advised he could return to work. This is given great weight, as it is supported

24

by the relevant evidence and is consistent with the records as a whole following his TIAs.

(Tr. 16)  Earlier in his decision, the ALJ pointed out that claimant was reporting that his conditions were stable.  (Tr. 18)   The final treatment record in the file showed that plaintiff's examination was "normal except for decreased sensation in the feet.  His gait was normal, and motor strength was 5/5 in the upper and lower extremities. * * * He refused to hear more about smoking cessation."  (Tr. 18)

Plaintiff argues that the ALJ's credibility determination is not supported by substantial evidence and that the reasons given by the ALJ do not support his credibility assessment.  The undersigned disagrees.  During the administrative hearing, plaintiff testified that the reason he did not return to work was because the doctor had not cleared him to return. (Tr. 33)  However, the medical records and examination findings do not support this statement. Plaintiff was encouraged to increase his physical activity and was told he could return to work.  (Tr. 272) This is a specific contradiction to which the ALJ pointed in support of his credibility assessment. (Tr. 19)  As previously noted, "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir. 2001).  "There is a 'zone of choice' within which the Commissioner can act, without the fear of court interference."  *Id.* at 773 [internal quotations omitted.]  The ALJ provided a clear explanation, supported by substantial evidence from the record, to support his findings related to plaintiff's credibility.

## VIII.   Conclusion

In summary, the court should find that the ALJ properly considered and weighed the evidence, including the medical opinion evidence; that he properly determined plaintiff's residual functional capacity; and that he properly assessed plaintiff's credibility.  The court

25

should further find that the ALJ's decision was supported by substantial evidence and that Mr.

Swogger has not demonstrated a basis upon which to reverse or remand the Commissioner's

decision.  Accordingly, I recommend that the final decision of the Commissioner be

AFFIRMED, pursuant to 42 U.S.C. § 405(g).

Dated: December 5, 2016

Thomas M. Parker
United States Magistrate Judge

_____

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts
within fourteen (14) days after being served with a copy of this document.  Failure to file
objections within the specified time may waive the right to appeal the District Court's order.  *See
U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985),
reh'g denied, 474 U.S. 1111 (1986).